UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JUSTO A. VAZQUEZ-BONILLA, JR.,

                  Plaintiff,

- against -

UNITED UNION OF ROOFERS LOCAL 8 and
NATIONAL ROOFING, INC.,

                  Defendants.
-------------------------------------------------------------X

NOT FOR PUBLICATION

MEMORANDUM AND ORDER
08-CV-0101(RRM) (LB)

MAUSKOPF, United States District Judge.

Plaintiff Justo A. Vazquez-Bonilla, Jr. ("Plaintiff") commenced this *pro se* action against Defendants United Union of Roofer's Local 8 ("Local 8" or the "Union") and National Roofing, Inc. ("National Roofing") alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq*. Before the Court are Defendants' separate motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, the motions are GRANTED.

I. BACKGROUND

A.    FACTS

The following facts are drawn from (i) Plaintiff's Complaint and Amended Complaint, (ii) Defendants' Local Rule 56.1 statements and the exhibits annexed thereto, and (iii) Plaintiff's Affirmations and other submissions in opposition to Defendants' motions.[1] The facts are either undisputed or set forth in the light most favorable to Plaintiff.

Sometime in 2004, Plaintiff, who is Hispanic, joined Local 8, a labor union which represents roofers and waterproofers. (Local 8 56.1 Stmt. (Docket No. 34-1) ¶ 4; Local 8 Notice of Mot. for Summ. J. (Docket No. 34) Ex. G: Deposition of Justo Vazquez-Bonilla, Jr. ("Pl. Dep.") at 34.)

---

[1] Plaintiff has failed to submit a counter-statement of undisputed facts pursuant to Local Rule 56.1(b).

Local 8 refers its members to various contractors seeking union workers for roofing and waterproofing jobs throughout the New York metropolitan area. (Local 8 56.1 Stmt. ¶¶ 7-8.) Although it is undisputed that Local 8 referred Plaintiff to numerous jobs at dozens of different worksites, Plaintiff specifically complains about four positions, each is discussed below.

1. *The All Ply Assignment*

In December 2004, Local 8 referred Plaintiff to work for All Ply Roofing Co., Inc. on a job site located at Montclair State University in New Jersey. (Pl. Dep. at 91-92; *see also* Local 8 Notice of Mot., Ex. F.) However, according to Plaintiff, the foreman at the job site called him a "snitch" when he refused to work for non-union wages and benefits. (Pl. Dep. at 97, 222.)

2. *The West Point Assignment*

On September 10, 2005, Local 8 referred Plaintiff to A.W. Farrell & Sons, Inc. to work on a roofing project located on the campus of the West Point Military Academy. (Local 8 56.1 Stmt. ¶ 12; *see also* Pl. Dep. at 48.) The following month, Gregory Beauhamp, who, like Plaintiff, is Hispanic, was assigned as the Local 8 union steward at the West Point project site. (Local 8 56.1 Stmt. ¶¶ 14-15; Pl. Dep. at 50-51, 192.) In addition to Local 8 members, workers from a different union based in Pennsylvania, the Local Union 210 United Union of Roofers, Waterproofers and Allied Workers, were also assigned to the West Point project. (Local 8 56.1 Stmt. ¶ 16.)

According to Plaintiff, prior to Beauhamp's arrival at West Point, he experienced "no problem whatsoever" with regard to his relationship with Local 8 and his coworkers. (Pl. Dep. at 47, 50.) However, in early November 2005, Plaintiff alleges that Beauhamp made "some sexual passes toward [him]" which were rebuffed. (*Id.* at 53.) At his deposition, Plaintiff testified that, after this incident, he began having "problems" with the foreman, as well as with other workers at the worksite. (*Id.* at 54.) Next, on November 9, 2005, Plaintiff was stopped by Military Police

2

officers on the West Point campus for driving through a stop sign. (*Id.*; *see also* Local 8 56.1 Stmt. ¶ 18.) A records check revealed that Plaintiff's driver's license had been suspended. (Local 8 Notice of Mot. for Summ. J., Ex. C.) According to Plaintiff, the officers kicked him, placed him under arrest, and held him in custody for approximately eight hours. (Pl. Dep. at 61-62.) Plaintiff testified that he believed that the Military Police stopped his vehicle and arrested him because he rejected Beauhamp's sexual advances. (*Id.* at 62-63.) According to Plaintiff, he overheard conversations among members of Local 210 which revealed that, on a prior occasion, Local 210 workers and Beauhamp had Military Police officers pull over a Local 8 worker that "[t]hey disliked because he was black." (*Id.* at 63-64, 206-207.) Plaintiff further testified that Beauhamp threatened to murder him and his family. (*Id.* at 68, 73.)

As a result of that traffic stop, Plaintiff's car was impounded, preventing him from commuting to and from the West Point campus. (Local 8 56.1 Stmt. ¶ 20.) However, Local 8 provided Plaintiff with a $3,000 "hardship distribution" which he used to obtain another vehicle. (*Id.* ¶¶ 20-21; Pl. Dep. at 203.) Local 8 also retained an attorney to represent him at a hearing related to the traffic violation. (Local 8 56.1 Stmt. ¶¶ 22-23.) However, according to Plaintiff, the attorney provided by Local 8 pressured him to plead guilty to a traffic violation when, in fact, he was not guilty of any infraction. (Pl. Dep. at 80, 222.) Following this incident, Plaintiff retained another attorney, Michael Sussman, who sent a letter to Tom Pedrick, Local 8's Trustee, which outlined Plaintiff's complaints about the West Point job. (Local 8 Notice of Mot., Ex. D.) Nick Siciliano, a Local 8 representative, investigated the concerns raised in Mr. Sussman's letter and determined that Plaintiff's allegations of discrimination were unfounded and, after consulting with Plaintiff, that Plaintiff himself wished to withdraw his complaints against the Union. (*Id.*, Ex. I:

3

Aff. of Nick Siciliano "Siciliano Aff.") ¶¶ 6-7, 9.) Plaintiff did not file a grievance with Local 8 concerning the West Point job. (Local 8 56.1 Stmt. ¶ 28.)

### 3. *The Nicholson & Galloway Assignment*

In July 2006, Local 8 referred Plaintiff to work at a job site for Nicholson & Galloway, Inc. (*See* Local 8 Notice of Mot., Ex. F.) According to Plaintiff, a supervisor at the job site "treated [him] like trash." (Pl. Dep. at 103, 229.) Plaintiff further stated that he was "harassed" and was assigned to clean up garbage, rather than perform his usual roofing duties. (*Id.* at 105, 108.) Plaintiff also testified that "animosity and problems" permeated the worksite because of tension with members of Local 154, a different union also working at the location. (*Id.* at 103.) Plaintiff worked at the Nicholson & Galloway site for several weeks before being laid off. (*Id.* at 104.)

### 4. *The National Roofing Assignment*

Nearly one year later, on June 20, 2007, Local 8 referred Plaintiff to a job with Defendant National Roofing. (Local 8 56.1 Stmt. ¶ 38; National Roofing 56.1 Stmt. (Docket No. 33-1) ¶ 3; Pl. Dep. at 112.) Approximately two hours into the workday, Plaintiff asked Dennis Cohen, National Roofing's owner, if he could be excused from work for the remainder of the day because his girlfriend needed a ride to a hospital. (National Roofing 56.1 Stmt. ¶ 4; Pl. Dep. at 115-116.) Plaintiff further testified that, although Mr. Cohen reacted negatively to, and denied, his request, he was eventually allowed to leave the worksite early because it began to rain, preventing further roofing work from being done that day. (*Id.* at 118-119.)

The next day Plaintiff reported to the National Roofing job site at 7:00 a.m., however, no other workers were at the site. (National Roofing 56.1 Stmt. ¶ 5; Pl. Dep. at 121.) After waiting for approximately two hours, Plaintiff called the National Roofing office, and was informed that, because it was raining, no work would take place that day and that all of the workers had been

called the previous evening to advise them that they did not need to appear for work the next morning. (National Roofing 56.1 Stmt. ¶¶ 4-5; Pl. Dep. at 122.) Plaintiff testified that he did not receive a phone call and that insisted that he be given "show up pay" for the two hours he spent waiting at the job site. (National Roofing 56.1 Stmt. ¶ 5; Pl. Dep. at 122-123.)

On June 28, 2007, Plaintiff did not receive an expected paycheck. (National Roofing 56.1 Stmt. ¶ 6; Pl. Dep. at 128-129.) When Plaintiff asked a foreman at the job site why he did not receive his check, he was informed that it had not been processed because Plaintiff had failed to submit time sheets and tax forms for his work. (National Roofing 56.1 Stmt. ¶¶ 6-7; Pl. Dep. at 129.) Plaintiff testified that he was not informed of a requirement to submit time records and that he had not been provided with tax forms to complete. (Pl. Dep. at 129.) However, Plaintiff was permitted to leave the job site early so that he could obtain his check at the National Roofing office. (National Roofing 56.1 Stmt. ¶ 7; Pl. Dep. at 131.) Plaintiff testified that, while at National Roofing's office, he overheard Mr. Cohen refer to him as a "miserable Puerto Rican" and that Mr. Cohen "was cursing his lungs out until I left the [office]." (Pl. Dep. at 132-133.) Plaintiff further testified that he spent less than five minutes in the office and that he received his paycheck after he filled out tax forms. (*Id.* at 135; *see also* National Roofing 56.1 Stmt. ¶ 7.)

Plaintiff testified that on June 30, 2007, at a different National Roofing job site, Mr. Cohen made hostile comments about his work and poked him in the chest with his finger. (Pl. Dep. at 144.) Plaintiff further testified that the following day, July 1, 2007, Mr. Cohen continued "the hostile treatment" and "hostile comments" while on the job site. (*Id.* at 145-146.) According to Plaintiff, as a result of Mr. Cohen's conduct, he did not return to work after July 2, 2007. (*Id.*; *see also* National Roofing 56.1 Stmt. ¶ 7.) Plaintiff also stated that, in addition to payment for the two hours of "show up time" on June 21, 2007 discussed above, he was also entitled to an increased pay

5

rate on June 30, 2007, but that National Roofing never increased his wages. (Pl. Dep. at 147-148, 164.) Plaintiff did not file any formal grievance with Local 8 concerning National Roofing. (*Id.* at 205.) However, Mr. Siciliano discussed the issue of Plaintiff's wages with Mr. Cohen and considered the issue resolved when Plaintiff did not raise the matter again. (Siciliano Aff. ¶ 13.)

Finally, on February 12, 2008, Plaintiff submitted a letter to Local 8 which indicated that he no longer wished to be represented by the Union and that he intended to join an international union. (Local 8 Notice of Mot., Ex. E; *see also* Pl. Dep. at 231-232.)

### B. PROCEDURAL HISTORY

Plaintiff commenced this action on January 4, 2008 and filed an Amended Complaint on July 30, 2008. Magistrate Judge Bloom provisionally closed discovery on January 9, 2009. On April 17, 2009, National Roofing filed its motion for summary judgment. On April 21, 2009, Local 8 filed its motion for summary judgment. Prior to Defendants' fully-briefed submissions, on February 25, 2009, Plaintiff submitted an Affidavit in Opposition to both motions. Thereafter, on May 5, 2009, Plaintiff submitted a separate response to each motion.[2]

## II. APPLICABLE LAW

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[2] On May 5, 2009, Plaintiff also provided the Court with a courtesy copy of a letter he sent to the President of the United States concerning this case. (*See* Docket No. 37.)

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed" and the court must draw all "justifiable" or "reasonable" inferences in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)); *see also Brosseau v. Haugen*, 543 U.S. 194, 195 n.1 (2004). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue* for trial,'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex*, 477 U.S. at 322) (internal quotation marks omitted) (alteration in original). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247-48).

B.  TITLE VII STANDARDS

The Second Circuit has emphasized "the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citations omitted). District courts must remain mindful that, when an employer has acted with discriminatory intent, direct evidence

7

of that intent will only rarely be available, so that "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). However, even in discrimination cases, a plaintiff must provide more than conclusory allegations to defeat a motion for summary judgment, *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), as "[s]ummary judgment remains available for the dismissal of claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997).

### C. TITLE VII HOSTILE WORK ENVIORNMENT AND RETALIATION STANDARDS

Construing Plaintiff's submissions liberally in light of his *pro se* status, the Court will also evaluate the evidence under the standards applicable to claims for retaliation and hostile work environment. To prove a charge of retaliation by an employer in violation of Title VII, a plaintiff must show that: (1) he was engaged in a protected activity; (2) his employer was aware of that activity; (3) he was subject to an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *See Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000). Similarly, to prove retaliation by a labor organization in violation of Title VII, a plaintiff must show that: (1) he was engaged in an activity protected under Title VII; (2) the union was aware of his participation in the protected activity; (3) he suffered adverse union decisions; and that (4) there was a causal connection between the protected activity and the adverse action taken by the union. *See Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1213 (2d Cir. 1993).

To establish a hostile work environment claim, a plaintiff must demonstrate that: (1) his workplace was permeated with discriminatory intimidation, ridicule and insult sufficiently severe or

pervasive to alter the conditions of his work environment; and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). The conduct in question "must be severe or pervasive enough to create an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive.'" *Schwapp*, 118 F.3d at 110 (quoting *Harris*, 510 U.S. at 22.) In other words, the first element of a hostile work environment claim requires allegations that demonstrate that the environment was both objectively and subjectively hostile and abusive. *See Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001).

In addition, to establish a hostile work environment claim, a plaintiff "must prove more than a few isolated incidents of [discriminatory] enmity. Casual comments, or accidental or sporadic conversation, will not trigger equitable relief pursuant to the statute." *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir. 1986) (citations omitted). In evaluating a hostile work environment claim, a court must consider "all of the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (quoting *Harris*, 510 U.S. at 23).

### III. DISCUSSION

Although vague, Plaintiff's submissions, when construed liberally in light of his *pro se* status,[3] appear to assert that: (1) he was racially discriminated against by National Roofing; (2) as a result of a hostile work environment, he was constructively terminated from his membership with

---

[3] "A document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89 (2007) (internal citations omitted)). Furthermore, courts should interpret *pro se* pleadings "'to raise the strongest arguments that they suggest.'" *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000) (quoting *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).

Local 8 and his assignment at National Roofing because of his ethnicity; and that (3) Local 8 retaliated against him.

A. PLAINTIFF'S CLAIMS AGAINST NATIONAL ROOFING

1. EMPLOYER LIABILITY UNDER TITLE VII

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §§ 2000e-2(a). The Court reviews Plaintiff's claims for workplace discrimination under Title VII according to the framework outlined in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 93 (1973). Under the *McDonnell Douglas* "burden-shifting" inquiry, in the absence of direct evidence of employment discrimination, a plaintiff must first establish a *prima facie* case of discrimination by demonstrating that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he was subjected to an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir. 2000). This burden is minimal and does not require specific evidence of discrimination. *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006). If a plaintiff meets this burden, the defendant employer must then articulate a "legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. A plaintiff must then provide evidence that the employer's explanation is a merely pretext designed to mask impermissible discrimination. *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001).

The ultimate burden to persuade the trier of fact "that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). It is insufficient for a plaintiff merely to create doubt

that the defendant's stated reason was the real reason for discharging him. He must also put forth "evidence that would permit a rational factfinder to infer that the discharge was actually motivated, in whole or in part, by discrimination" on the basis of his race. *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 561 (2d Cir. 1997).

In this case, although Plaintiff satisfies the first two prongs of the *McDonnell Douglas* analysis, he has failed to show that he suffered an adverse employment action giving rise to an inference of discrimination. "It is well-settled that an inference of discriminatory intent may be derived from a variety of circumstances, including, but not limited to: '. . . the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994); *see also Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (inference arises when "employer subjected [employee] to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group").

Although in his Amended Complaint Plaintiff claims that he suffered "racial discrimination," (see Am. Compl. ¶ 4), his submissions in opposition to National Roofing's motion contain no argument or allegation reasonably suggesting discrimination. For example, Plaintiff has not presented evidence that similarly situated non-Hispanic employees were treated more favorably or subjected to different standards. To the contrary, other than Mr. Cohen's single derogatory remark, further discussed below, Plaintiff presents no evidence that his job performance was criticized in any way,[4] that he was treated less favorably or otherwise differently than any other

---

[4] At his deposition, Plaintiff stated that Mr. Cohen admonished him for staining a white roof with his boots. (*See* Pl. Dep. at 126-28.) However, there is no indication that Mr. Cohen directed degrading language at Plaintiff.

worker employed with National Roofing, nor does he adequately allege any ethnically-charged pattern of events leading up to his voluntary termination sufficient to give rise to an inference of discriminatory animus. Accordingly, Plaintiff has failed to establish a *prima facie* case of discrimination.

Even if Plaintiff could meet his *prima facie* burden, he has failed to provide any evidence that the legitimate, nondiscriminatory explanation proffered by National Roofing is a pretext for any discriminatorily motivated employment action. Specifically, Plaintiff claims that National Roofing failed to timely pay him and that he was required to travel to the National Roofing office to collect his paycheck, instead of receiving it at the job site with his co-workers. (*See* Attach. to Am. Compl. (Docket No. 16) at 6; *see also* Docket No. 36 ¶ 3.) However, it is undisputed that Plaintiff failed to submit the requisite time sheets and tax forms necessary to receive his paycheck at the job site on June 28, 2007; rather, Plaintiff concedes that he was allowed to leave work early to fill out the appropriate paperwork and obtain his check that same day. (*See* Pl. Dep. at 129-31.)[5]

In sum, Plaintiff has failed to provide evidence, other than his own conclusory allegations, from which a reasonable jury could conclude that Plaintiff suffered an adverse employment action giving rise to an inference of discrimination or that National Roofing was motivated by Plaintiff's ethnicity when it took any action concerning the conditions of his employment. *See Cameron v. Cmty. Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003) (finding "[p]urely conclusory allegations of discrimination" insufficient to defeat summary judgment).

---

Moreover, although Plaintiff testified that it seemed like Mr. Cohen was directing his comments at him, he conceded that Mr. Cohen was also upset with other workers on the roof and overheard him "screaming on the other side [of the roof]."). (*Id.* at 127.)

[5] Plaintiff also asserts that National Roofing failed to pay him increased hourly wages for his final day of work and failed to provide "show up pay" for two hours on June 21, 2007. (*See* Attach. to Am. Compl. (Docket No. 16) at 6.) There is no evidence in the record, however, which indicates that Plaintiff filed a grievance or otherwise attempted to address these concerns in accordance with the express terms of his Collective Bargaining Agreement ("CBA"). (*See* Pl. Dep. at 234-35.) In any event, assuming *arguendo* that National Roofing violated the CBA, Plaintiff has presented no evidence that it did so under circumstances giving rise to an inference of discrimination.

## 2. HOSTILE WORK ENVIRONMENT/CONSTRUCTIVE DISCHARGE

Plaintiff also contends that while he was employed by National Roofing, Mr. Cohen subjected him to "personal mistreatment . . . racial slurs and gestures in front of my family and co-workers" and "[m]istreatment and humiliations in front of others with bad remarks and comments against my race." (Am. Compl. ¶ 8; Attach. to Am. Compl. (Docket No. 16) at 6.) At his deposition, Plaintiff further alleged that Mr. Cohen yelled or cursed at him on several occasions and poked him in the chest with his finger on two occasions. (*See generally*, Pl. Dep. at 133-145.) As a result of this conduct, Plaintiff testified that he "decided to not go back to work [at National Roofing] ever since." (*Id.* at 146.) Therefore, construed liberally, Plaintiff appears to allege that, as a result of Mr. Cohen's allegedly abusive conduct, he was constructively discharged from his position with National Roofing. *See Petrosino v. Bell Atl.*, 385 F.3d 210, 229 (2d Cir. 2004) ("[A]n employee is constructively discharged when his employer . . . intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily . . ."). However, as discussed below, Plaintiff's allegations are insufficient to withstand summary judgment.

"Creation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case." *Pa. State Police v. Suders*, 542 U.S. 129, 149 (2004). However, a hostile work environment claim is available only in cases where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal quotations and citations omitted); *see also Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004). When assessing the existence of a hostile work environment, courts consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id.* (internal quotation omitted).

Drawing all inferences in his favor, Plaintiff has arguably demonstrated that Mr. Cohen treated him disrespectfully or unfairly on several occasions during the course of his nine-day employment with National Roofing. Specifically, Plaintiff states that Mr. Cohen reacted negatively when Plaintiff asked to be excused from work early, cursed when Plaintiff inquired about his missing paycheck, and yelled at, or spoke harshly with, Plaintiff on several occasions. Even assuming, however, that Mr. Cohen's remarks were abrasive or abusive, these incidents fall well short of the level of severity and pervasiveness required to sustain a hostile work environment claim. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (Title VII "does not set forth 'a general civility code for the American workplace'") (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)); *see also Schwapp*, 118 F.3d at 110 ("[f]or racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity . . . there must be a steady barrage of opprobrious racial comments") (quotations and citations omitted). In addition, Mr. Cohen's single race-based comment that Plaintiff was a "miserable Puerto Rican" cannot be categorized as sufficiently pervasive. *Cf. Mark v. Brookdale Univ. Hosp.*, No. 04 Civ. 2497, 2005 WL 1521185, at *27 (E.D.N.Y. June 22, 2005) (finding "two alleged isolated remarks" by a supervisor insufficiently "frequent and pervasive"); *Upshur v. Dam*, No. 00 Civ. 2061, 2003 WL 135819, at *7-*8 (S.D.N.Y.

14

Jan. 17, 2003) (finding "patronizing and racist comments" by supervisor over the course of a single week insufficient). Regardless, "the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001). Only where decision-makers "repeatedly make comments that draw a direct link between a plaintiff's membership in a protected class and an adverse employment action" can an inference of discriminatory animus be drawn. *Constantin v. N.Y. City Fire Dep't*, No. 06 Civ. 04631, 2009 WL 3053851, at *15 (S.D.N.Y. Sep. 22, 2009) (internal quotation marks omitted). In sum, Plaintiff has failed to demonstrate conduct by Mr. Cohen or others at National Roofing that would rise to the level of intimidation, ridicule or insult sufficient to withstand summary judgment. Moreover, because a hostile work environment is a necessary predicate to a constructive discharge claim, this failure is similarly fatal to that related claim.

    B.    PLAINTIFF'S CLAIMS AGAINST LOCAL 8

        1. PLAINTIFF'S CLAIMS ARE NOT TIME-BARRED

As a threshold matter, a plaintiff may not bring a Title VII claim concerning events which occurred more than 300 days prior to the filing of a Title VII charge with a state or local agency authorized to hear such actions. 42 U.S.C. § 2000e-5(e). In this case, Plaintiff filed administrative charges of discrimination on September 25, 2007. (*See* Local 8 Notice of Mot., Ex. A.) Local 8 contends that the claims that Plaintiff alleges occurred prior to November 29, 2006—that is, all work assignments Local 8 referred Plaintiff to except for his final job with National Roofing—are time-barred. This Court does not agree. "[I]f incidents are a part of an alleged hostile work environment, the limitations period requirement is met if one of the incidents meeting the requirements of such an environment occurs within the period." *Milne v. Navigant Consulting*, No. 08 Civ. 8964, 2009 WL 4437412, at *3 (S.D.N.Y. Nov. 30, 2009) (citing *Nat'l R.R. Passenger*

*Corp. v. Morgan*, 536 U.S. 101, 116-17 (2002). In this case, under an appropriately broad reading of Plaintiff's Amended Complaint, his deposition testimony, and his submissions in opposition to Local 8's motion, Plaintiff adequately asserts that his entire tenure with the Union, culminating with the National Roofing job, was permeated with incidents of racial discrimination. (*See, e.g.*, Attach. to Am. Compl. (Docket No. 16) at 6; Pl. Dep. at 217.) Plaintiff therefore alleges a continuous, unbroken pattern and practice of alleged discrimination sufficient to assert discrimination claims with respect to conduct occurring more than 300 days prior to the filing of his administrative charges. Accordingly, the Court will evaluate all of Plaintiff's claims against Local 8.

2. LABOR ORGANIZATION LIABILITY UNDER TITLE VII

Title VII makes it unlawful for a labor organization "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §§ 2000e-2(a), (c). However, "Title VII claims against labor organizations are analyzed differently than Title VII claims against employers." *Burke v. CWA Local 1109, AFL-CIO*, No. 07 Civ. 3595, 2009 WL 3805517, at *3 (E.D.N.Y. Nov. 12, 2009) (citing *Oparaji v. United Fed'n of Teachers*, 418 F. Supp. 2d 139, 146 (E.D.N.Y. 2006). "To establish a Title VII claim by a union member against his or her union, the plaintiff must first show that the union breached its duty of fair representation to the union member." *Id.* (citations omitted). "Once the plaintiff establishes a breach of the duty of fair representation, [he] must demonstrate that the adverse action was motivated by unlawful discrimination or retaliation. *Id.* (citing *Oparaji*, 418 F. Supp. 2d. at 146). "A union breaches the duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." *Marauez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44 (1998). As

explained below, Plaintiff has failed to establish that Local 8 breached its duty of fair representation.

In his opposition to Local 8's motion, Plaintiff states that "[a]s a Union member [he] was never represented properly [b]ecause of [Local 8's] [i]llegal actions . . . ." (Pl.'s Aff. in Opp. to [Local 8]'s Mot. ¶ 3.) Plaintiff, however, presents no evidence that Local 8 failed to properly represent him as a member of the Union. To the contrary, it appears from the record in this case that Plaintiff's two specific complaints of job-site discrimination were investigated and resolved. First, although Plaintiff did not file a formal Union grievance, when the Union received a letter from Mr. Sussman relating Plaintiff's complaints of discrimination at the West Point job site, a Local 8 representative investigated his claims until Plaintiff himself considered the matter resolved. (*See* Siciliano Aff. ¶¶ 6-10.) Second, Plaintiff's complaint concerning National Roofing's failure to compensate him for the two hours "show up pay" which he contended he was owed for time spent at the National Roofing job site when work had been cancelled due to rain was also investigated by a Local 8 representative. (*Id.* ¶¶ 12-13.) As noted earlier, there is no evidence in the record to suggest that Plaintiff ever filed a single formal grievance with Local 8 as expressly required by the procedures outlined in his CBA.

### 3. HOSTILE WORK ENVIRONMENT/CONSTRUCTIVE DISCHARGE

As explained below, even if Plaintiff could demonstrate that Local 8 breached its duty of fair representation, he has failed to show that Local 8's actions were motivated by discriminatory animus. In this case, it is undisputed that Plaintiff was not excluded from his union membership or otherwise fired from any job Local 8 referred him to; indeed, Plaintiff voluntarily resigned his membership with Local 8. (*See* Local 8 Notice of Mot., Ex. E; *see also* Pl. Dep. at 146-47.) Nevertheless, at this deposition, Plaintiff stated that Local 8 referred him to various employers "to

be harassed and mistreated" and that "[i]n the whole entire union, nobody wanted to hear a word of what [he] was saying." (Pl. Dep. at 217.) As noted earlier, an employer may constructively discharge an employee in violation of Title VII when it intentionally creates a hostile workplace to the extent that an employee is forced to involuntarily quit. *See Petrosino*, 385 F.3d at 229. Therefore, the Court construes Plaintiff's claims to allege that that his membership with Local 8 was constructively terminated because of his ethnicity.

However, a review of the record indicates that any claim against Local 8 for constructive discharge cannot withstand summary judgment. First, Plaintiff does not allege that any discriminatory event took place at the All Ply work site. Indeed, Plaintiff conceded at his deposition that he was asked to work "off the books" at All Ply for economic reasons—not because of his race. (*See* Pl. Dep. at 101.) Next, Plaintiff testified that racially derogatory comments and tension on the West Point job site primarily concerned the actions of members of Local 210—not Local 8. (*Id.* at 64.) Similarly, Plaintiff's allegations concerning animosity on the Nicholson & Galloway job principally involved members of Local 154—not Local 8. (*Id.* at 103.) Moreover, the Union investigated Plaintiff's claims of discrimination at the West Point job site and found them to be unsubstantiated. (*See* Siciliano Aff. ¶ 6.) Finally, it is undisputed that Local 8 hired an attorney to represent Plaintiff at the West Point traffic hearing and provided him with funds to obtain a new vehicle.

In sum, considering all of the evidence in the light most favorable to Plaintiff, no reasonable juror could find that Plaintiff was discharged from Local 8 because of his race. In this case, Plaintiff relies only on pure speculation and conclusory assertions, rather than presenting evidence sufficient to support a finding that Local 8 created an intolerable work environment because of his race and thereby caused him to resign his Union membership. For example, Plaintiff states that the

Union provided him with a "fixed" attorney and disregarded various threats against his family. (Attach. to Pl.'s Aff. in Opp. to [Local 8's] Mot.) Plaintiff also describes Local 8 as "crooked" and "playing tricks and scams . . . to gain wealth." (*Id.*) (internal quotation marks omitted). However, Plaintiff's pleadings, deposition testimony, and submissions in opposition to summary judgment are utterly devoid of evidence to substantiate any of his claims. As the Second Circuit has explained, "[t]o allow a party to defeat a motion for summary judgment by offering only conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri* 759 F.2d at 998.

### 4. RETALIATION CLAIM

Plaintiff also complains of "retaliation." (*See* Am. Compl. 4.) A labor organization may not retaliate against a union member because that member has "opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge of discrimination under [Title VII]." 42 U.S.C. § 2000e-3(a). As noted earlier, to prove retaliation by a labor organization in violation of Title VII, a plaintiff must show that: (1) he was engaged in an activity protected under Title VII, (2) the union was aware of his participation in the protected activity, (3) he suffered adverse union decisions, and (4) there was a causal connection between the protected activity and the adverse action taken by the union. *See Malarkey* 983 F.2d at 1213. In this case, Plaintiff's Amended Complaint and his submissions in opposition to Local 8's motion contain no evidence that the Union retaliated against him in any way for engaging in any protected activity. Indeed, Plaintiff did not file administrative charges of discrimination until approximately two months *after* he quit the National Roofing job and stopped seeking job referrals from Local 8.[6]

---

[6] Although Plaintiff's submissions are vague with respect to specific claims of retaliation, to the extent that Plaintiff lodged complaints concerning job assignments or his treatment at worksites with supervisors or his coworkers, this activity would not constitute "protected activity" within the scope of the Title VII, as Plaintiff did not participate in any proceeding pursuant to Title VII while he was employed with the various contractors Local 8 referred him to. *See*

Finally, to the extent that Plaintiff asserts a "retaliation" claim based on the incident in which he alleges that he rejected Mr. Beauhamp's sexual overtures at the West Point job, (see Pl. Dep. at 62-63, "So I decided, I felt the retaliation was from Gregory Beauhamp, from the beginning on the job site"), this claim is not cognizable under Title VII because Plaintiff does not allege that any retaliatory conduct by Mr. Beauhamp—who, like Plaintiff, is Hispanic—stemmed from his participation in protected activity. In any event, Plaintiff did not raise the alleged incident with Mr. Beauhamp in his EEOC complaint or in his initial or Amended Complaints; rather, Plaintiff raised this specific allegation for the first time at his deposition in this case. (*See* Pl. Dep. at 53-54.) Therefore, because this sexual harassment claim is not reasonably related to the claims of racial discrimination Plaintiff filed with the EEOC, it may not be considered by this Court. *See Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712 (2d Cir. 1998).

## IV. CONCLUSION

For the reasons set forth above, the Court concludes that Defendants are entitled to summary judgment. Therefore, Defendants' motions for summary judgment are GRANTED. The Clerk of Court is directed to enter judgment accordingly and close the case.

SO ORDERED.

Dated: Brooklyn, New York
      March 16, 2010

/S/
_____
ROSLYNN R. MAUSKOPF
United States District Judge

---

*Townsend v. Benjamin Enters.*, No. 05 Civ. 9378, 2008 WL 1766944, at *2 (S.D.N.Y. Apr. 17, 2008) ("[I]n order to gain protection under the participation clause, the participation must be in an investigation or proceeding covered by Title VII, and thus not in an internal employer investigation") (quoting *Correa v. Mana Prods., Inc.*, 550 F. Supp. 2d 319, 329 (E.D.N.Y. 2008)).